[No. 34738-5-II. Division Two. July 24, 2007.]

HOMESTREET, INC., ET AL., *Appellants*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

828

Gregg D. Barton, Scott M. Edwards, and Robert L. Mahon III (of Perkins Coie, LLP), for appellants.

Robert M. McKenna, Attorney General, and Donald F. Cofer and Mary C. Lobdell, Assistants, for respondent.

¶1  QUINN-BRINTNALL, J. — HomeStreet, Inc., sued the Department of Revenue (DOR) for a refund of business and occupation (B&O) taxes it alleged that it had overpaid. This case of first impression requires that we address whether RCW 82.04.4292 allows a lender to deduct, as "amounts derived from interest received," service fees it earned on qualifying home loans it originated and then sold on the

secondary market under agreements that required loan servicing.[1] If RCW 82.04.4292 allows the deductions for income from qualifying loans HomeStreet services but no longer owns, then it overpaid. We hold that when HomeStreet sold qualifying loans on the secondary market, it no longer received interest and was not entitled, under RCW 82-.04.4292, to a deduction from its income in calculating its B&O tax obligation. Accordingly, HomeStreet is not entitled to the requested refund, and we affirm the trial court's summary judgment in favor of DOR.

## DISCUSSION

The Statutory Deduction

¶2 RCW 82.04.4292 allows those engaged in "banking, loan, security or other financial businesses" to deduct "amounts derived from interest received on" certain investments or loans when computing their B&O taxes. Specifically, the statute provides:

> In computing tax there may be deducted from the measure of tax by those engaged in banking, loan, security or other financial businesses, *amounts derived from interest received* on investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties.

RCW 82.04.4292 (emphasis added).

---

[1] When servicing a loan, HomeStreet receives the loan payments directly from the borrowers, posts these payments, generally oversees the loans, receives information from the borrowers, pays required taxes and insurance payments, collects on delinquent accounts, prepares statements, and otherwise administers the loan. As part of its servicing obligations, HomeStreet may also be required to process foreclosures and bankruptcies.

The Loans and Servicing Rights[2]

¶3 HomeStreet, Inc.,[3] HomeStreet Capital Corporation,[4] and HomeStreet Bank[5] (collectively HomeStreet) originate, sell, securitize,[6] and buy residential loans that are primarily "secured by first mortgages or deeds of trust on non-transient residential properties." 2 Clerk's Papers (CP) at 305.[7]

¶4 HomeStreet sells or securitizes most of the loans it originates on the secondary market.[8] It sells the loans or securitized interests two ways:[9] (1) "servicing released," which means that HomeStreet sells the loan or security

---

[2] The parties do not dispute most of the facts in this case. The following facts are from the uncontested information the parties provided at summary judgment unless otherwise noted.

[3] HomeStreet, Inc., formerly Continental, Inc., is the holding company for HomeStreet Bank and the parent corporation of HomeStreet Bank and HomeStreet Capital Corporation.

[4] HomeStreet Capital Corporation, formerly Continental Mortgage Company, Inc., administers certain loan programs.

[5] HomeStreet Bank, formerly Continental Savings Bank, is a chartered savings bank that originated some of the loans at issue.

[6] "Securitization" refers to the process of issuing mortgage-backed or mortgage-related securities. According to the Federal National Mortgage Association's (Fannie Mae) annual report to the United States Securities and Exchange Commission, the term "mortgage-related securities" refers "generally to mortgage securities that represent beneficial interests in pools of mortgage loans or in other mortgage-related securities." 2 Clerk's Papers at 342.

[7] For purposes of this appeal, only "investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties" are relevant. RCW 82.04.4292.

[8] HomeStreet retains in its entirety approximately 10 percent of the loans it originates and apparently does not pay B&O tax on the interest it collects on those loans. Whether the B&O tax deduction applies to any part of the interest HomeStreet collects on these loans is not at issue in this appeal.

[9] The contracts between HomeStreet and Fannie Mae also discuss the sale and purchase of "participation interests." *See* 2 CP at 369. The contracts define a "participation interest" as

[a]n undivided interest in mortgages, specified in the applicable participation certificate that is evidence of such interest. A "participation interest" or "participation interest in mortgages" consists of a specified percentage of the principal (and a like percentage of all rights and benefits of the mortgagee or equivalent party under such mortgage) together with a specified yield on it.

without "retaining" the right to service the loan or security or (2) "servicing retained," which means that HomeStreet sells the loan but "retains" the right to service the loan or security. 1 CP at 160. Purchasers may pay a "premium" for a servicing released sale.[10] 3 CP at 543. HomeStreet also purchases the rights to service loans it does not originate.[11]

¶5 In return for servicing the service retained loans, HomeStreet is entitled to retain a portion of the borrowers' interest payments, generally 0.35 to 0.40 percent of the interest portion of the payment; a set percentage of the remaining principal balance; or, in certain instances, "the difference between the interest rate on the loan and the interest rate on the security for which it serves as collateral, computed on the same principal amount and for the same period as the interest portion of the installment." 4 CP at 617. It appears that HomeStreet takes its payment from the loans' interest streams.[12] In this dispute, HomeStreet generally refers to the amounts it retains from the borrowers' interest payments as "retained interest." *See* 3 CP at 538.

¶6 HomeStreet's servicing obligations and the amount of interest it may "retain" are set out in sales and servicing contracts between HomeStreet and the purchaser of the

2 CP at 370. Because HomeStreet's refund claim involves only loans in which it allegedly retained the servicing rights only and not an undivided interest in the mortgage, this case does not relate to any income HomeStreet may have received from participation interests. Whether RCW 82.04.4292 applies to amounts generated by retained servicing rights related to participation interests is a different question than the question presented here because HomeStreet would clearly retain some ownership interest in the loan as a whole in that case whereas, here, HomeStreet's interests appear to be entirely contractual.

[10] HomeStreet apparently records these premiums as a "gain on sale of the mortgage," not as "servicing income." 3 CP at 543. HomeStreet's refund request does not involve these premiums.

[11] HomeStreet has apparently purchased servicing rights from the Oregon State Housing Program.

[12] Chapter 6, section 6-3(A)(1) of Government National Mortgage Association's (Ginnie Mae) *Mortgage Backed Securities Guide* provides, "The fee for servicing each pooled mortgage is based on and payable only from the interest portion of each monthly installment of principal and interest actually collected by the issuer on the mortgage." 4 CP at 617.

loans, usually Fannie Mae (Federal National Mortgage Association).[13] These contracts specifically state that the contractual agreement is between HomeStreet and the purchaser of the loans[14] rather than between HomeStreet and the investors who are ultimately entitled to the principal and remaining interest or between HomeStreet and the borrowers.

¶7 The contracts HomeStreet provided DOR[15] in discovery establish that HomeStreet is entitled to retain a portion of the interest it collects from the borrower and expressly state that this is *compensation* to HomeStreet for performing servicing obligations for the purchasers of the loans under these contracts. Most of the contracts, the related servicing guides, and other related documents and agreements also state that HomeStreet is selling "all of its right, title, and interest in the mortgage" and that these sales are "absolute." 3 CP at 422.

¶8 In most instances, HomeStreet can sell or transfer the servicing contract and retain any fee or proceeds from

---

[13] For instance, part I, chapter 2, section 202.01 of *Fannie Mae Servicing Guide* (as revised on January 31, 2003), entitled "Processing of Funds," provides:

The servicer's authorization to receive, handle, or dispose of funds representing mortgage payments (for principal, interest, and tax and insurance escrows) or of other funds or assets related to the mortgages it services for us or to the properties secured by those mortgages is limited to those servicing actions that are expressly authorized in this *Guide* or in the Contract. Since these funds and assets are owned by Fannie Mae and other parties (such as the borrower, a participating lender, or a mortgage-backed security holder), the servicer in its handling of these funds is acting on behalf of, and as a fiduciary for, Fannie Mae and other parties, as their respective interest may appear—and not as a debtor of Fannie Mae. If the servicer takes any action with respect to these funds or assets that is not expressly authorized—such as the withdrawal or retention of mortgage payment funds we are due as an offset against any claim the servicer may have against us the servicer is not only violating the provisions of this *Guide* and the Contract, but also is violating the rights of any and all other parties that have a beneficial interest in the funds. Such action is therefore prohibited and will be considered a breach of Section VIII.A.2 of the Contract.

3 CP at 514.

[14] In the case of securities issued through or guaranteed by Ginnie Mae, the contract may be between the "issuer" (here, HomeStreet) and Ginnie Mae.

[15] DOR provided the trial court with copies of these contracts in its motion in opposition to HomeStreet's motion for summary judgment.

an approved sale or transfer, or, if the contract is terminated, it is entitled to some form of lump sum compensation. Although it does not appear that HomeStreet has ever exercised this right, the contracts also give HomeStreet the right to sell its servicing rights on the secondary market as stand-alone assets. The sales and servicing contracts, however, generally require the loan purchaser's prior approval or consent.

¶9 In addition, HomeStreet can, and occasionally does, hire third parties as subservicers to perform some services required under the sales and servicing contracts. Generally, HomeStreet pays the third party servicers, or subservicers, a fixed fee not related to the size of the loan or the income stream generated by the loan.

¶10 Because HomeStreet retains a portion of the interest the borrower pays based on a percentage of interest or principal rather than receiving a flat fee for servicing the loan, HomeStreet's income from the servicing right is contingent on several factors, such as the size of the loan, interest rate fluctuations, the length of the loan, whether the borrower prepays the loan, and whether the borrower defaults on the loan or the loan is foreclosed. Despite these variables, HomeStreet's servicing and administrative costs are relatively fixed.

DOR AUDIT

¶11 In 1995, DOR's audit division issued written instructions to HomeStreet, informing it that RCW 82.04.4292 did not apply to the amounts HomeStreet retained from the interest payments made on servicing retained loans. Despite this notice, HomeStreet continued to follow its reading of a previous DOR contrary determination, DOR Determination No. 92-403,[16] and deducted the amounts received on

---

[16] DOR Determination No. 92-403 addressed a petition for correction of assessment and refund brought by Continental, Inc., and Continental Savings Bank. In it, the administrative law judge (ALJ) concluded that the "retained interest" at issue was "interest" for purposes of RCW 82.04.4292 because the taxpayers did not sell their entire ownership interest in the loans but, instead, retained part of the

servicing retained loans from its gross income before calculating its tax obligation.

¶12 Following an audit, DOR assessed B&O tax on the income HomeStreet had retained from payments it collected on servicing retained loans for the period of January 1, 1997 to December 31, 2001. DOR also required Home-Street to start paying B&O tax on this income.[17]

REFUND ACTION AND SUMMARY JUDGMENT

¶13 HomeStreet subsequently reported and paid $20,224.72 in B&O taxes on "retained interest" received on servicing retained loans during January 2003. In March 2003, HomeStreet sued for a refund, arguing that the income generated by the "retained servicing rights" was deductible under RCW 82.04.4292 as an amount derived from interest received on qualifying loans. It brought this action under RCW 82.32.180. Relying on DOR Determination Nos. 92-392[18] and 92-403 and questioning DOR Deter-

---

asset and the borrower still had a "primary and direct" obligation to the taxpayers "as to the portion of the loan retained." 1 CP at 152. The ALJ noted that the payments the taxpayers retained were the result of a relationship between the borrowers and the taxpayers that was "completely independent" of the investors' purchase of securities representing other portions of the loans. 1 CP at 153. The ALJ distinguished other DOR determinations because those taxpayers had transferred their entire interest in the loans and the retained interest was due to a contractual relationship between the old and new owners.

[17] In December 2002, DOR and HomeStreet entered into a "closing agreement" settling the assessment for the January 1, 1997 to December 31, 2001 audit period. 1 CP at 145. This agreement did not preclude HomeStreet from disputing whether the income generated by the retained servicing rights for subsequent periods was deductible under RCW 82.04.4292.

[18] In DOR Determination No. 92-392, the taxpayer originated qualifying loans, pooled the loans, and sold them on the secondary mortgage market backed "under federal mortgage-backed guarantee programs." 1 CP at 59. "Investors purchase[d] certificates representing undivided interests in these pools." 1 CP at 59. The taxpayer *did not, however, transfer all of its rights in the loans it originated* and sold the loan at a lower interest rate than the borrower agreed to pay. "As part of the sales arrangement, the taxpayer agree[d] to continue collecting the borrower's payments on the loans," retaining the balance of the interest that was not forwarded to the investor and recording the amounts collected as "loan service fees." 1 CP at 61. The issue was whether the B&O deduction applied when the "taxpayer has transferred the right to receive all of the principal to the investors" but retained some of the interest and provided loan servicing. 1 CP at 61. The ALJ

mination No. 98-218,[19] which overruled DOR Determination No. 92-392 in part, HomeStreet moved for summary judgment.

---

held that a loan is "an entire bundle of economic rights," 1 CP at 61, that could be separately assigned and that

> [t]o conclude that the amounts received are not interest would create an anomaly in the tax law which we do not think was contemplated by the legislature. Such a conclusion would mean that amounts which are plainly interest to the borrower are nonetheless not interest to those who have the right to receive it under the terms of the borrowing instrument. We conclude that the amounts in question constitute interest within the meaning of RCW 82.04.4292.

1 CP at 67-68 (footnotes omitted). But the ALJ also noted that the outcome could have been different had the taxpayer sold its entire ownership interest in the loans, and the agreements or contracts indicated that "the interest collected from the borrower was . . . bargained for consideration specifically for the rendering of collections and distribution services" rather than the servicing being "merely incidental to the distribution of the payment between the lender and investors." 1 CP at 71-72.

[19] In DOR Determination No. 98-218, the taxpayer protested DOR's "denial of the deduction on loans that were closed in the taxpayer's name and sold on the secondary market," and DOR Determination No. 98-218 primarily addressed whether the deduction applies to loan origination fees (LOFs). *See* 1 CP at 96. In discussing the nature of the LOFs, the ALJ noted, "Fees charged by lenders for specific services are *not* interest. *These include . . . servicing fees.*" 1 CP at 101 (emphasis added) (citing Determination No. 88-255, 6 Wash. Tax. Dec. 123 (Wash. Dep't of Revenue June 29, 1988)). The ALJ further noted that although DOR generally found that income generated after the lender sells the loan but retains a portion of the interest payment while providing loan services were fees for services rather than interest, DOR had not applied this rule uniformly. The ALJ then held that DOR Determination No. 92-392 was incorrect. In criticizing DOR Determination No. 92-392, the ALJ stated that DOR had "failed to consider the risk of interest rate fluctuations," noting that the taxpayer in that case "would not gain or suffer a loss if the market interest rate changed." 1 CP at 105. The ALJ concluded that once the taxpayer sells the loan and no longer has an investment in the loan, the income it receives is not interest. In evaluating the LOFs, the key factors the ALJ addressed were whether the taxpayer had a *continuing investment in the loan* or whether the taxpayer was acting for another party. The ALJ also emphasized that DOR must look to "the substance of the transaction and not merely its form" to determine whether the "fees charged the borrower are for specific services or for the use or forbearance of money." 1 CP at 107-08. But the ALJ also assessed whether the taxpayer still bore the risk of an interest rate decline. The taxpayer also had to be the "owner" of the loan or investment, meaning that the taxpayer "*is the party who is entitled to receive the principal of the loan*[; s]*tated another way, the owner of the loan or investment is the person* [*who*] *retains the risk of interest rate fluctuations.*" 1 CP at 111 (emphasis added). Finally, the ALJ specifically overruled DOR Determination No. 92-392 "to the extent it *states the portion of the interest income stream retained by the seller of a qualifying mortgage continues to be deductible under RCW 82[.]04[.]4292 despite the seller's lack of risk of interest rate fluctuation.*" 1 CP at 112.

Specifically, HomeStreet asserted that it was entitled to the deduction under DOR's new approach in DOR Determination No. 98-218, which limited the

¶14 It asserted three arguments in support of summary judgment. First, it argued that the amounts it received from the retained servicing rights were, in substance, interest because they were subject to interest rate fluctuations and other factors that affect income generated by a loan and because the servicing rights are imbedded in every residential mortgage loan. Second, it argued that according to DOR's expert, Earl Baldwin, the retained servicing assets are *"derivatives* that are paid from interest on the underlying mortgage loan" and that, therefore, they qualify for the deduction under RCW 82.04.4292. Br. of Appellant at 15 (emphasis added) (citing 1 CP at 50). Finally, it argued that DOR's refusal to allow the deduction undermined the legislative intent behind the deduction, which it characterized as attempting " 'to stimulate the residential housing market by making residential loans available to home buyers at lower cost through the vehicle of a B&O tax [deduction] on interest income received by home mortgage lenders.' " 1 CP at 189 (quoting *Dep't of Revenue v. Sec. Pac. Bank of Wash. Nat'l Ass'n*, 109 Wn. App. 795, 804, 38 P.3d 354 (2002)). HomeStreet did not, however, cite support for its conclusion that DOR's current interpretation would dampen home mortgage lending, nor did any of the documents it submitted in support of its summary judgment motion touch on this issue.

¶15 DOR opposed HomeStreet's summary judgment motion, arguing that so called "retained interest" was a fee for services rather than interest and that the fact the payments were taken from or calculated with reference to the interest collected from the loans or investments did not establish that it was income "derived from interest received." RCW 82.04.4292. DOR also asserted that Home-Street mischaracterized Baldwin's statement regarding

deduction to the "owner" of the loan or investment. HomeStreet argued that it was the "owner" of the loans or securities because DOR Determination No. 98-218 held that an "owner" of a loan or investment is " 'the person who retains the risk of interest rate fluctuations,' " and interest rate fluctuations affected the amount of income generated by the retained servicing rights. 1 CP at 188 (emphasis omitted).

whether servicing income is "derived" from interest and provided a declaration from Baldwin to that effect, and asserted that the legislative history of the deduction statute showed that the deduction was intended to apply only to "interest earned by the owner of the loan." 4 CP at 761.

TRIAL COURT'S RULING

¶16  Noting that HomeStreet's financing methods did not exist 35 years ago when the legislature enacted RCW 82.04.4292, the trial court denied HomeStreet's motion for summary judgment, granted DOR summary judgment, and dismissed HomeStreet's claim with prejudice.

¶17 HomeStreet appeals the denial of its motion for summary judgment and the order granting DOR summary judgment.

## ANALYSIS

¶18  We review an order of summary judgment de novo, engaging "in the same inquiry as the trial court, [and] treating all facts and reasonable inferences from the facts in a light most favorable to the nonmoving party." *Enter. Leasing, Inc. v. City of Tacoma*, 139 Wn.2d 546, 551, 988 P.2d 961 (1999) (citing *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998); *Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 625, 911 P.2d 1319 (1996)). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). "Where, as here, the parties do not dispute the material facts, [we] will affirm an order on summary judgment if the moving party is entitled to judgment as a matter of law." *Enter. Leasing*, 139 Wn.2d at 551-52 (citing CR 56(c); *Barnes v. McLendon*, 128 Wn.2d 563, 569, 910 P.2d 469 (1996)).

TAX DEDUCTION STANDARDS

¶19 In this case, we interpret the language of a B&O deduction provision. Generally, taxation is the rule

and deductions or exemptions are exceptions to the rule. *Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 174, 500 P.2d 764 (1972) (citing *Fibreboard Paper Prods. Corp. v. State*, 66 Wn.2d 87, 401 P.2d 623 (1965)). Thus, we construe deductions to taxation narrowly and the party claiming the deduction has the burden of showing that it qualifies for the deduction. *Budget Rent-A-Car*, 81 Wn.2d at 174-75 (citing *Group Health Coop. of Puget Sound, Inc. v. Tax Comm'n*, 72 Wn.2d 422, 433 P.2d 201 (1967); *All-State Constr. Co. v. Gordon*, 70 Wn.2d 657, 425 P.2d 16 (1967); *Yakima Fruit Growers Ass'n v. Henneford*, 187 Wash. 252, 60 P.2d 62 (1936)).

██ ██ ¶20 If a deduction statute is ambiguous, we construe the statute " 'strictly, though fairly and in keeping with the ordinary meaning of [the] language, against the taxpayer.' " *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 150, 3 P.3d 741 (2000) (quoting *Group Health*, 72 Wn.2d at 429). Furthermore, when addressing tax classifications, we look to the substance rather than form of the business activity at issue to assess the proper classification. *See Time Oil Co. v. State*, 79 Wn.2d 143, 147, 483 P.2d 628 (1971) (citing *Wash. Sav-Mor Oil Co. v. Tax Comm'n*, 58 Wn.2d 518, 364 P.2d 440 (1961)).

GENERAL RULES OF STATUTORY INTERPRETATION

██ ██ ¶21 Statutory interpretation is a question of law, which we review de novo. *Enter. Leasing*, 139 Wn.2d at 552 (citing *Millay v. Cam*, 135 Wn.2d 193, 198, 955 P.2d 791 (1998)). When construing a statute, our goal is to give effect to legislative intent. *Enter. Leasing*, 139 Wn.2d at 552 (quoting *State v. Sweet*, 138 Wn.2d 466, 477-78, 980 P.2d 1223 (1999)). We first look to the plain language of the statute to determine its meaning. *Enter. Leasing*, 139 Wn.2d at 552 (quoting *Sweet*, 138 Wn.2d at 478). We review the disputed statutory language within the context of the statute as a whole, *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995) (citing *Human Rights Comm'n v. Cheney Sch. Dist. No. 30*, 97 Wn.2d 118,

121, 641 P.2d 163 (1982)), and avoid "[s]trained, unlikely or unrealistic" interpretations. *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993).

¶22 Absent ambiguity or a statutory definition, we give the words in a statute their common and ordinary meaning. *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). In determining the plain meaning of an undefined term, we may look to the dictionary to ascertain the common meaning of the term. *Garrison*, 87 Wn.2d at 196.

¶23 " 'Where a statute is susceptible to more than one meaning, it is ambiguous.' " *Sehome Park Care Ctr.*, 127 Wn.2d at 778 (quoting *Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc.*, 125 Wn.2d 305, 312, 884 P.2d 920 (1994)). If a statute is ambiguous, we look to other evidence of legislative intent, such as legislative history. *See Sehome Park Care Ctr.*, 127 Wn.2d at 778. In addition, we "accord great weight to the contemporaneous construction placed upon [the statute] by officials charged with its enforcement, especially where the Legislature has silently acquiesced in that construction over a long period." *Sehome Park Care Ctr.*, 127 Wn.2d at 780.

B&O Taxes and Deduction

¶24 The State imposes B&O tax on the privilege of doing business in this state. RCW 82.04.220. DOR computes B&O tax by classifying the taxpayer's activity according to various statutory definitions and applying specific tax rates to the gross income of the business. *See* RCW 82.04.220. Businesses engaged in the business of providing financial and banking services are generally taxable under the "service and other activities" classification of the B&O tax. Former RCW 82.04.290 (2001); WAC 458-20-146.

¶25 For purposes of the B&O tax, the legislature has defined "gross income" as

> the value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales,

*compensation for the rendition of services*, gains realized from trading in stocks, bonds, or other evidences of indebtedness, *interest*, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.

RCW 82.04.080 (emphasis added); *see also* WAC 458-20-146.

■ ■ ¶26 RCW 82.04.4292 allows those engaged in "banking, loan, security or other financial businesses" to deduct "amounts derived from interest received on" certain investments or loans when computing their B&O taxes. The sole issue in this case is whether the trial court properly determined that there was no genuine issue of material fact as to whether the disputed amounts were "derived from interest received." We agree with the trial court that there is not.

¶27 Factually, we note that HomeStreet's chief financial officer, Debra Johnson, stated in a deposition that HomeStreet may record the income generated by the retained servicing rights contracts at issue as "servicing income" and that she was certain HomeStreet did not record this income as "retained interest." 3 CP at 540-41. This suggests that the disputed income was derived from providing services rather than from interest received on investments or loans. More importantly, under the plain language of RCW 82.04.4292,[20] the income in question is compensation for the servicing of the loans that is provided for in the contracts between HomeStreet and the secondary market purchasers, not a receipt by HomeStreet of interest paid by the borrower for the continued use of HomeStreet's funds.

---

[20] As previously noted, RCW 82.04.4292 states, "In computing tax there may be deducted from the measure of tax by those engaged in banking, loan, security or other financial businesses, amounts derived from interest received on investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties."

¶28 HomeStreet argues that the statutory phrase *"derived from* interest" includes any income taken from and related to the borrower's interest payment and that the documents before the trial court on summary judgment clearly established that the income in question was withheld from and related to the borrower's interest payments. It further asserts that Baldwin's deposition establishes that the income is " 'paid from interest' " and is " 'embedded as a part of [interest],' " and that he "testified that HomeStreet's retained interest (servicing) assets are *derivatives* that are paid from interest on the underlying mortgage loan." Br. of Appellant at 15 (emphasis added) (citing CP at 50). It also asserts that because this income is sensitive to many of the same factors affecting direct interest income, such as the principal balance of the loan, interest rate fluctuations, and the duration of the loan, this income is similar to interest and that the legislature intended such income to be deductible under RCW 82.04.4292.

¶29 For its part, DOR contends that the amounts in question are fees for loan services provided, regardless of whether their ultimate source is the interest portion of the borrower's payment. DOR argues that the phrase "derived from interest" "means the taxpayer must 'receive' interest" and that this portion of HomeStreet's income is not from interest but rather from fees derived solely from its contractual servicing rights. *See* Br. of Resp't at 13. It also asserts that, at least as to the loans it sells to Fannie Mae, HomeStreet sells "all its legal and beneficial interest in the secured loans"; that it is the "servicing contract that generates its income and not the secured loans"; and that HomeStreet's only interest is contractual and this "is not secured by any lien against any real property of the borrower." Br. of Appellant at 14.

¶30 Neither the term "interest" nor the phrase "derived from" are defined by the B&O tax statutes. Because these are undefined terms, we examine the plain meaning of these terms and may look to the dictionary to ascertain the common meaning. *Garrison*, 87 Wn.2d at 196.

¶31 "Interest" is commonly defined as a "charge for the use or forbearance of money." *Sec. Sav. Soc'y v. Spokane County*, 111 Wash. 35, 37, 189 P. 260 (1920); *see also Clifford v. State*, 78 Wn.2d 4, 6, 469 P.2d 549 (1970) (citing MERRIAM-WEBSTER THIRD INTERNATIONAL DICTIONARY (1964)). "Derived" is defined as "formed or developed out of something else," WEBSTER'S THIRD INTERNATIONAL DICTIONARY 608 (1976), or "[r]eceived from specified source." BLACK'S LAW DICTIONARY 444 (6th ed. 1990). Thus, the plain language of the statute requires that the amount at issue be an amount "formed or developed" from a charge made for the use or forbearance of money.

¶32 The documents the parties submitted at summary judgment show that HomeStreet is allowed to keep or "retain" part of the interest stream generated by the loans *in exchange for servicing the loans*. In this respect, the income is, in the broadest sense, "derived from interest" because HomeStreet deducts it directly from the interest stream the loans generate. But HomeStreet's argument ignores the fact that the only reason it is entitled to income is its *contractual relationship* with the purchaser of the loan for servicing the loans and that it is merely allowed to pay itself by "retaining" part of the contract purchaser's interest payment in return.

¶33 When HomeStreet or any mortgage lender originates a mortgage loan, it creates a relationship between itself and the borrower by allowing the borrower to use its money in return for interest on its capital. This relationship falls squarely within the statutory tax deduction. But when HomeStreet sells the loan on the secondary market, it recovers the capital it invested and the borrower is no longer paying HomeStreet for using its money. And, in servicing retained sales, HomeStreet retains only the right to provide loan servicing for the purchaser of the loan and to be compensated for those services.[21] Although Home-Street has clearly established that servicing rights are a

---

[21] To become a servicer for Fannie Mae, one of the things HomeStreet had to show was that one of its "principal business purposes" was "servicing such mortgages." 2 CP at 371. This strongly suggests that HomeStreet intended to

marketable asset, this asset is no longer directly related to the borrower's use of HomeStreet's capital, and, as evidenced by the servicing contracts between HomeStreet and the loan purchasers, the direct relationship between the borrower and HomeStreet is severed.

¶34 In fact, *any* servicer or subservicer, including those that never invested any capital in the serviced loans, could make the same argument HomeStreet relies on if the servicer or subservicer negotiated payment terms that required that the source of payment would be the borrower's interest payment. HomeStreet's approach is thus overbroad, unreasonable, and ignores the requirement that we construe tax deduction statutes narrowly. *Budget Rent-A-Car*, 81 Wn.2d at 174-75; *see also Simpson Inv. Co.*, 141 Wn.2d at 150 (if the statute is ambiguous, this court must construe the statute " 'strictly, though fairly and in keeping with the ordinary meaning of [the] language, against the taxpayer' " (quoting *Group Health*, 72 Wn.2d at 429)).

¶35 We agree with the trial court that RCW 82.04.4292 allows HomeStreet to deduct interest income from qualifying home loans in computing its B&O tax but not income it earns from servicing loans it originated but then sold. We, therefore, affirm summary judgment for DOR.

HOUGHTON, C.J., and VAN DEREN, J., concur.

Review granted at 163 Wn.2d 1022 (2008).

generate income from its servicing activities, not just by lending capital to borrowers.