[No. 38347-1-II.   Division Two.   March 9, 2010.]

SPRINT INTERNATIONAL COMMUNICATIONS CORPORATION, *Appellant*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

*Michele G. Radosevich* (of *Davis Wright Tremaine LLP*), for appellant.

*Robert M. McKenna, Attorney General, Cameron G. Comfort, Senior Assistant,* and *Brett S. Durbin, Assistant,* for respondent.

*Michael S. Kelley* and *Stephanie Anderson* on behalf of Microsoft Corporation, amicus curiae.

¶1 ARMSTRONG, J. — In 1995, the Department of Revenue (Department) conducted an audit of Sprint International Communications Inc. for the sale of transmission services via its SprintNet X.25 network and frame relay network from 1989 to 1993. The Department determined the services were subject to retail sales tax as "network telephone services" under the statutes in effect during the audit period. *See* former RCW 82.04.250 (1993); former RCW 82.04.050(5) (1993); former RCW 82-.04.065(2) (LAWS OF 1983, 2d Ex. Sess., ch. 3, § 24). Sprint paid the $1,248,344 assessment and filed a refund claim. The superior court granted the Department's motion for summary judgment. On appeal, Sprint assigns error to

the trial court's ruling that the X.25 and frame relay networks are network telephone services.[1] We affirm.

## FACTS

¶2 Telecommunications companies began offering data communication services over packet-switched networks in the mid-1970s.[2] X.25 protocol, a worldwide accepted standard defining the interface between a packet-switched network and end-user equipment, was first introduced in 1976. Companies generally stopped building X.25 networks around 1990 and switched to newer technologies, such as frame relay. The frame relay standard was approved in 1991.

¶3 Throughout the audit period, 1989 to 1993, Sprint sold data transmission services via the SprintNet X.25 packet-switched network. Sprint began selling transmission services via its frame relay packet-switched network in 1992. Both networks consisted of circuits purchased from other telecommunications companies, packet switches Sprint owned and operated, and terminal processing equipment Sprint owned and operated.

## I. THE X.25 NETWORK

¶4 Customers accessed the X.25 network via dial access over the public telephone system or via dedicated access over a private line. The X.25 network transmitted information in a synchronous protocol. Personal computers and

---

[1] Sprint also assigns error to the superior court's ruling that Sprint was not denied equal protection of the law. Sprint provides no argument or authority for this assigned error and therefore waives the issue. *See* RAP 10.3(a)(6); *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[2] "Packet switching" is a method for routing signals across a telecommunications network. It breaks a transmission into "packets" containing address information that packet switches read to route the packet to the next available circuit required to reach the transmission's destination. Packets from multiple users can be interspersed during transmission, allowing multiple users to transmit data over a single circuit simultaneously.

data terminals typically transmit information in an asynchronous protocol. The X.25 network was therefore equipped with packet assembler/disassembler devices that converted asynchronous signals into synchronous X.25 packets for transmission over the network. The X.25 network was not part of the Internet during the audit period.

¶5 Sprint's X.25 customers were predominantly banking and financial institutions, followed by information service providers, government agencies, manufacturing companies, and computer companies. Customers used the X.25 network to transmit data between their data centers, databases, and remote office locations. Information service providers such as Westlaw, Dow Jones, and America Online used the X.25 network to provide their customers with access to their information databases and servers. The X.25 network itself did not provide users with access to information.

## II. THE FRAME RELAY NETWORK

¶6 Sprint's frame relay network provided customers with a dedicated connection between destination pairs of host computers, similar to a private line. Customers used the frame relay network to transmit data between offices through host-to-host data transmission. The frame relay network did not perform asynchronous/synchronous protocol conversion, and it was not part of the Internet during the audit period.

## ANALYSIS

¶7 We review an order of summary judgment de novo. *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 607, 998 P.2d 884 (2000). Summary judgment is appropriate only if there is no genuine issue of material fact in the pleadings, affidavits, depositions, and admissions on file and the moving party is entitled to judgment as a matter of law. CR 56(c).

¶8 The Department argues that the X.25 and frame relay networks are "network telephone services" under the plain language of former RCW 82.04.065, the statute in effect throughout the audit period. Sprint does not argue that former RCW 82.04.065 is ambiguous. Rather, Sprint argues that we should interpret former RCW 82.04.065 in accordance with contemporaneous federal regulations and subsequent amendments to the statute. We therefore begin with an overview of the statute's history and subsequent amendments.

## I. FORMER RCW 82.04.065: HISTORY AND AMENDMENTS

¶9 Until 1981, the legislature imposed a public utility tax on traditional telephone services. *See W. Telepage*, 140 Wn.2d at 602. The legislature recognized "the impending revolution in telecommunications services" and equalized the State's tax treatment of telephone companies and their unregulated competitors by broadening the definition of companies susceptible to the public utility tax. *W. Telepage*, 140 Wn.2d at 602; LAWS OF 1981, ch. 144, § 1. The legislature broadly defined "telephone business" under former RCW 82.16.010(6) (LAWS OF 1981, ch. 144, § 2(6)), which was the predecessor to the definition of "network telephone service" under former RCW 82.04.065(2).[3]

¶10 As predicted, the telecommunications industry underwent unprecedented change in the 1980s, with the breakup of the AT&T telephone system monopoly and the emergence of new telecommunications services, such as cable television and cellular telephones. *See W. Telepage*,

---

[3] " 'Telephone business' [is] the business of providing access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or providing telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, or similar communication or transmission system. . . ." Former RCW 82.16.010(6). In 1983, the legislature deleted this definition from former RCW 82.16.010 and placed it under former RCW 82.04.065 as "network telephone service." LAWS OF 1983, 2d Ex. Sess., ch. 3, §§ 24, 32, *codified as* RCW 82.04.065(2).

140 Wn.2d at 603-04. Several of these new industries sought and obtained exemptions from the public utility tax, which are reflected in the legislature's 1983 amendments:

> "Network telephone service" means the providing by any person of access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or the providing of telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. . . . "Network telephone service" does not include the providing of competitive telephone service, the providing of cable television service, nor the providing of broadcast services by radio or television stations.

LAWS OF 1983, 2d Ex. Sess., ch. 3, § 24, *codified as* RCW 82.04.065(2); *see also W. Telepage*, 140 Wn.2d at 604. This 1983 statute was in effect throughout the audit period.

¶11 The telecommunications industry continued to rapidly evolve with the emergence of Internet services. Although the origins of the Internet date back to the 1950s with the development of ARPANET, a packet-switched network used for military and university research, Internet usage was not widespread until the mid-1990s. Before 1991, the federal government paid for the "backbone" service that allowed the Internet to operate and restricted Internet use to the higher educational system; commercial users were not allowed access. In the early 1990s, three major events contributed to a surge in Internet usage: the "world wide web" program was released in 1991, the first web browser was released in 1993, and the government transitioned responsibility for the Internet's backbone service to commercial Internet service providers in 1995.

¶12 In 1997, the legislature amended Washington's tax statutes to define "Internet service"[4] and exclude such services from "network telephone service." LAWS OF 1997, ch.

---

[4] " 'Internet service' [is] a service that includes computer processing applications, provides the user with additional or restructured information, or permits the user to interact with stored information through the internet or a proprietary

304, § 4, *codified as* RCW 82.04.297; LAWS OF 1997, ch. 304, § 5, *codified as* RCW 82.04.065. The legislature stated:

> The legislature finds that the newly emerging business of providing internet service is providing widespread benefits to all levels of society . . . and that, as this industry emerges, it should not be burdened by new taxes that might not be appropriate for the type of service being provided. The legislature further finds that there is no clear statutory guidance as to how internet services should be classified for tax purposes and intends to ratify the state's current treatment of such services.

LAWS OF 1997, ch. 304, § 1.[5] To prevent this "newly emerging business" from being improperly taxed, the legislature imposed a two-year moratorium on municipal taxation of Internet services. LAWS OF 1997, ch. 304, § 2, *codified as* RCW 35.21.717.

¶13 In 2007, the legislature adopted the "Streamlined Sales and Use Tax Agreement." LAWS OF 2007, ch. 6, § 901. Adopting the agreement's telecommunications definitions, the legislature amended former RCW 82.04.065 to replace "network telephone service" with "telecommunications service."[6] LAWS OF 2007, ch. 6, § 1002(8), *codified as* RCW 82.04.065(8). The legislature stated, "These are changes to

---

subscriber network. 'Internet service' includes [the] provision of internet electronic mail, access to the internet for information retrieval, and hosting of information for retrieval over the internet or the graphical subnetwork called the world wide web." LAWS OF 1997, ch. 304, § 4, *codified as* RCW 82.04.297.

[5] The State's "current treatment" consisted of an administrative regulation governing the taxation of information and computer services. WAC 458-20-155. Based on this regulation, the Department drew a distinction "between those persons who are engaged in the business of furnishing a particular medium over which data is transmitted and those furnishing the data or information services being transmitted." Wash. Dep't of Revenue, Determination No. 90-128, 9 Wash. Tax Dec. 280-1, at 4 (1990). In 1995, the Department classified Sprint's X.25 service as a network telephone service in accordance with these regulations.

[6] " 'Telecommunications service' [is] the electronic transmission, conveyance, or routing of voice, data, audio, video, or any other information or signals to a point, or between or among points. 'Telecommunications service' includes such transmission, conveyance, or routing in which computer processing applications are used to act on the form, code, or protocol of the content for purposes of transmission, conveyance, or routing without regard to whether such service is referred to as voice over internet protocol services or is classified by the federal communications commission as enhanced or value added." Former RCW 82.04.065(8) (LAWS OF 2007, ch. 6, § 1002(8)).

terminology in current law, but do not change current law regarding taxability and exemptions." FINAL B. REP. on Substitute S.B. 5089, at 3, 60th Leg., Reg. Sess. (Wash. 2007).

## II. THE X.25 NETWORK

¶14 When interpreting a statute, our fundamental objective is to ascertain the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). If a statute's language is clear, we derive its meaning from that plain language. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). We will not add or subtract from a statute's clear language "even if we believe the Legislature intended something else but did not adequately express it[,] unless the addition or subtraction of language is imperatively required to make the statute rational." *Watson*, 146 Wn.2d at 955 (footnote omitted).

¶15 The plain language of "network telephone service" in effect during the audit period includes "data . . . communication or transmission for hire." Former RCW 82.04.065(2). As the Supreme Court concluded in *Western Telepage*, "On its face, [RCW 82.04.065] is not ambiguous. It defines precisely the range of activity that falls within its purview—the transmission of telephonic, video, data, or similar communication by telephone line or microwave." *W. Telepage*, 140 Wn.2d at 609. The statute's structure shows legislative intent to broadly define "network telephone service." While the statute specifically includes most forms of electronic communication, the legislature expanded the definition with catchall provisions to include all "similar" communication and transmission services. *See* former RCW 82.04.065. This broad definition is followed by express exclusions for specific services. *See* former RCW 82.04.065. Thus, "where the Legislature did not expressly exclude [a] service[ ] from the broad definition of network telephone services . . . , it must be assumed the Legislature did so intentionally." *W. Telepage*, 140 Wn.2d at 611.

¶16 The parties agree that the X.25 network provided data communication services via telecommunications circuits throughout the audit period. The X.25 network does not fall under one of the specific exemptions and is, therefore, a "network telephone service" under the plain language of former RCW 82.04.065.

¶17 The statute's legislative history supports this interpretation. The legislature intentionally enacted a broad definition to encompass emerging competitors of the regulated telephone industry. *See* LAWS OF 1981, ch. 144, § 1. The legislature was aware that technology in the telecommunications industry was advancing rapidly, but it chose to provide specific exemptions for emerging businesses instead of limiting the statute's scope. *See* LAWS OF 1981, ch. 144, § 1; LAWS OF 1983, 2d Ex. Sess., ch. 3, § 32. The legislature did not exempt services such as the X.25 network, even though it appears that it was aware of such technology. Packet-switched networks and X.25 protocol emerged in the mid-1970s. In 1981, a representative for the General Telephone Company of the Northwest (GTE) testified before the legislature and stated that GTE and its subsidiaries intended to become "aggressive competitors" in the telecommunications industry. Clerk's Papers (CP) at 41. The representative specifically mentioned that "[o]ur subsidiary, Telenet[,] is offering electronic mail service and high speed electronic switching packages." CP at 41. Sprint's X.25 network was formerly operated by Telenet as the Telenet X.25 network. Thus, the legislature was aware that services such as Sprint's X.25 packet-switched network were potential competitors to the regulated telephone companies, yet it chose not to exempt such services in the statute.

## A. Contemporaneous FCC Regulations

¶18 Sprint argues that the X.25 service is an enhanced service under contemporaneous Federal Communications Commission (FCC) regulations and, therefore, distinguishable from a network telephone service. In 1980, the FCC

adopted a rule distinguishing regulated "basic telecommunications services" from unregulated "enhanced services." *In re Second Computer Inquiry*, 77 F.C.C.2d 384, ¶ 281 (1980) (amending 47 C.F.R. § 64.702). "Enhanced services" are "[transmission] services which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information . . . ." *In re Second Computer Inquiry*, 77 F.C.C.2d 384, at App. ¶ 1 (subpart G(a)); *see In re Second Computer Inquiry*, 77 F.C.C.2d 384, ¶ 287 (citing to the text of the amendment reproduced in the Appendix). Sprint argues that the X.25 network is an enhanced service because it performs asynchronous/synchronous protocol conversions that "act on the format, content, code, [or] protocol" of the customer's transmitted information. Br. of Appellant at 18 (emphasis omitted).

¶19 Even if the X.25 network is an enhanced service under FCC regulations, former RCW 82.04.065 did not distinguish between basic and enhanced transmission services. And we will not add language to an unambiguous statute unless it is "imperatively required to make the statute rational." *Watson*, 146 Wn.2d at 955. Furthermore, this FCC regulation was in effect when the 1983 legislature enacted former RCW 82.04.065. The legislature could have adopted similar language if it intended to distinguish between basic and enhanced transmission services. Even when the legislature eventually adopted a definition of "telecommunications service" that was similar to the FCC's definition of enhanced services, it specifically stated that a transmission service qualifies as a telecommunications service "without regard to whether such service is . . . classified by the federal communications commission as enhanced or value added." *See* former RCW 82.04.065(8) (LAWS OF 2007, ch. 6, § 1002(8)).

## B. Subsequent Amendments

¶20 Sprint's main argument is that the X.25 service is not a "network telephone service" because it is an "Internet

service" under the 1997 amendments or a "value-added nonvoice data service" under the 2007 amendments.[7] Specifically, Sprint argues the X.25 service is an Internet service under former RCW 82.04.297 (1997) because it provided access to an interoperable packet-switched network (i.e., a network that converts signals, allowing asynchronous computers to transmit information over the synchronous X.25 network). Alternatively, Sprint argues the X.25 is functionally equivalent to the Internet and should be treated as an Internet service for tax purposes. In an amicus brief, Microsoft Corporation argues that the X.25 service is an Internet service under former RCW 82.04.297 because it connected dial-in customers to proprietary subscriber networks. Finally, Sprint argues, the X.25 service is a value-added nonvoice data service because it performs asynchronous/synchronous protocol conversion "primarily for a purpose other than transmission." Former RCW 82.04-.065(17) (LAWS OF 2007, ch. 6, § 1002(17)).

¶21 Sprint asserts that the 1997 and 2007 amendments clarified existing law and relate back to the audit period, but it provides no argument related to this assertion. Because we hold the 1997 and 2007 amendments do not apply retroactively, we do not reach arguments based on those amendments.

¶22 We presume that a statutory amendment is prospective. See State v. Smith, 144 Wn.2d 665, 673, 30 P.3d 1245 (2001). This strong presumption is " 'deeply rooted in our jurisprudence.' " Smith, 144 Wn.2d at 673 (internal quotation marks omitted) (quoting State v. Cruz, 139 Wn.2d 186, 190, 985 P.2d 384 (1999)). A party can overcome this presumption in certain circumstances, such as when the

---

[7] " 'Value-added nonvoice data service' [is] a service that otherwise meets the definition of telecommunications services in which computer processing applications are used to act on the form, content, code, or protocol of the information or data primarily for a purpose other than transmission, conveyance, or routing." Former RCW 82.04.065(17) (LAWS OF 2007, ch. 6, § 1002(17)).

amendment is clearly curative.[8] *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 223, 173 P.3d 885 (2007). But we generally disfavor retroactivity. *Smith*, 144 Wn.2d at 673.

¶23 Sprint appears to be arguing that the 1997 and 2007 amendments are curative because they "clarified" the law. *See* Br. of Appellant at 24-25. A curative amendment clarifies or technically corrects an ambiguous statute. *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 461, 832 P.2d 1303 (1992). As we previously discussed, former RCW 82.04.065 is not ambiguous. *See also W. Telepage*, 140 Wn.2d at 609. Where a statute is unambiguous, we presume that a subsequent amendment constitutes a substantive change in the law and does not apply retroactively. *F.D. Processing*, 119 Wn.2d at 462. Even if former RCW 82.04.065 (1983) contains a latent ambiguity that arose with the emergence of Internet service, the 1997 and 2007 amendments are not curative because they do not clarify the 1983 legislature's original intent.[9] An amendment is curative "where the original enactment was ambiguous." *Overton v. Econ. Assistance Auth.*, 96 Wn.2d 552, 558, 637 P.2d 652 (1981); *see also F.D. Processing*, 119 Wn.2d at 462 (holding an amendment is not curative where the parties did not present any legislative history from the time of the original statute supporting their characterization of the legislature's original intent).

¶24 The 1997 legislature amended former RCW 82.04-.065 (1983) to address the "newly emerging business" of Internet service, which did not become widely available until the

---

[8] A party can also overcome this presumption if the legislature explicitly provides for retroactivity or the amendment is remedial. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 223, 173 P.3d 885 (2007). Legislative intent for retroactivity must be direct and unambiguous. *See Smith*, 144 Wn.2d at 672; *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 460, 832 P.2d 1303 (1992). Retroactive application of a remedial statute must further its remedial purpose. *Macumber v. Shafer*, 96 Wn.2d 568, 570, 637 P.2d 645 (1981). Sprint does not argue that the 1997 or 2007 legislature unambiguously intended retroactive application, or that the amendments are remedial.

[9] A latent ambiguity is apparent only when a statute's language is applied to particular facts and is not apparent on the face of the statute. *State v. Delgado*, 148 Wn.2d 723, 63 P.3d 792 (2003).

mid-1990s. *See* LAWS OF 1997, ch. 304, § 1. The 2007 legislature adopted the Streamlined Sales and Use Tax Agreement, which was first promulgated in 2005. LAWS OF 2007, ch. 6, § 901; FINAL B. REP. on Substitute S.B. 5089, *supra*. Neither the 1997 nor the 2007 legislature corrected an ambiguity in the original statute or clarified the 1983 legislature's intent. Instead, prospective application is consistent with the 1983 legislature's intent to enact a broad definition of "network telephone service" that would encompass advances in the telecommunications industry unless and until the legislature specifically exempted them.

¶25 Sprint has not overcome the strong presumption in favor of prospective application. *See Smith*, 144 Wn.2d at 673. Accordingly, we decline to apply these amendments retroactively, and we hold that the X.25 service was properly classified as a network telephone service under the plain language of former RCW 82.04.065 (1983), the statute in effect during the audit period.[10] We next consider Sprint's argument that the legislature intended former RCW 82.04.065 (1983) to tax only public telephone transmissions and its frame relay network transmitted information over private lines.

---

[10] Although we do not consider Sprint's argument that the X.25 service is an "Internet service" because it performs protocol conversion, we note that we recently rejected a similar argument in *Qualcomm, Inc. v. Department of Revenue*, 151 Wn. App. 892, 907, 213 P.3d 948 (2009). In *Qualcomm*, we held that a truck tracking system was a "network telephone service" because it "provides the medium over which the customer's data is communicated and . . . does not provide 'new information to its customers.' " *Qualcomm*, 151 Wn. App. at 906-07 (quoting Wash. Dep't of Revenue, Determination No. 05-0325, 27 Wash. Tax Dec. 99, 107 (2009)). Although the tracking system performed some data processing, " '[d]ata conversions and protocol conversions occur in most, if not all, communication systems' " and these conversions alone "do not mandate that the service be deemed an 'information service.' " *Qualcomm*, 151 Wn. App. at 907. Because the tracking system performed data processing to facilitate communication between the truck and the dispatch center, we concluded its primary purpose was transmission rather than data manipulation. *Qualcomm*, 151 Wn. App. at 907-08. Similarly, the X.25 service did not provide customers with new information, and it performed asynchronous/synchronous protocol conversion in order to facilitate transmission across the synchronous X.25 network.

III. The Frame Relay Network

¶26 Former RCW 82.04.065 (1983) includes a service that transmits data "via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system." Former RCW 82.04.065(2) (1983). The frame relay network transmitted data via permanent network connections that are similar to a private line. Sprint argues that the frame relay network is not a "network telephone service" under former RCW 82.04.065 (1983) because the statute's plain language excludes private line service. Sprint reasons that the statute limits network telephone service to transmission via a "local" or "toll" service and cites tariffs from the Pacific Northwest Bell Company and federal tax law to show that those terms have technical meanings that do not include private line service. Br. of Appellant at 37-39 (citing Wash. Utils. & Transp. Comm'n, Tariff WN U-10, Pac. Nw. Bell Co. at 3d Revision of Sheet 5134, "Regulations," (effective May 20, 1981)); 40-41 (citing 26 U.S.C. § 4252).

¶27 We discern a statute's plain meaning from its language. *Tingey v. Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007). When a term has an accepted, ordinary meaning, we look to a regular dictionary for its meaning. *Tingey*, 159 Wn.2d at 658. When a technical term is used in its technical field, we apply its technical meaning. *Tingey*, 159 Wn.2d at 658.

¶28 The tariffs and tax law Sprint cites do not establish that "local" and "toll" have a technical meaning within the telecommunications field. Telecommunications companies are required to file tariff schedules with the Washington Utilities and Transportation Commission showing the rates and charges for the services the company provides. RCW 80.36.100. Pacific Northwest Bell's tariffs were written by the company and merely show that it charged different rates for public network and private line services. The federal definitions merely show how those terms were

defined for federal tax purposes. *See* 26 U.S.C. § 4252. Furthermore, the statute does not limit network telephone service to local and toll services: "local" modifies "telephone network" and "toll" modifies "line or channel," but neither term modifies "cable, microwave, or similar communication or transmission system[s]." Former RCW 82.04.065(2) (1983). Even if local and toll service do have technical meanings that exclude private line service, Sprint has not demonstrated that "cable, microwave, or similar communication or transmission system[s]" also exclude private line service.

¶29 Finally, the statute's plain language does not describe any of the listed networks as "public" or otherwise distinguish between public and private networks. *See* former RCW 82.04.065 (1983). The ordinary meanings of the listed terms simply refer to different modes of transmission: a "channel" is "a fixed, accustomed, or official course of communication or transmission of information." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 374 (2002). A "cable" is a "ropelike . . . assembly of electrical conductors." WEBSTER'S, *supra*, at 310. A "microwave" is "a very short electromagnetic wave." WEBSTER'S, *supra*, at 1429. These terms do not distinguish between public and private modes of transmission. Because the statute's plain language does not exclude private line service, the frame relay network is also a "network telephone service" under former RCW 82.04.065 (1983).

¶30 Because Sprint has not shown that the amending statutes of 1997 and 2007 apply retroactively to the taxing period at issue or that the legislature intended the 1983 statute to tax only public transmissions, the trial court did not err in granting the Department summary judgment.

VAN DEREN, C.J., concurs.

¶31 QUINN-BRINTNALL, J. (concurring in the result) — Although I agree with statutory analysis in the majority opinion, I write separately to discuss the procedural posture of this and numerous other tax cases.

¶32 Here, the Department of Revenue (DOR) and Sprint International Communications Inc. filed cross motions for summary judgment. The underlying issue is whether Sprint was subject to a retail sales tax for the sale of transmission services via X.25 from 1989 through 1993. Despite the posture of this case as a summary judgment below, DOR, Sprint, and amicus curiae Microsoft Corporation continue to present *fact-based* arguments to this court regarding whether Sprint X.25 is a network telephone service. While the parties stipulated to the configuration of the X.25 system, they still dispute whether the primary purpose of the X.25 service is data transmission or protocol conversion. To me, this is a disputed issue of material fact that precludes summary judgment. *See W. Telepage, Inc. v. City of Tacoma Dep't of Financing*, 140 Wn.2d 599, 607, 998 P.2d 884 (2000) ("Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact."); *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980) ("A material fact is one upon which the outcome of the litigation depends, in whole or in part."); *Coffel v. Clallam County*, 58 Wn. App. 517, 520, 794 P.2d 513 (1990) ("Even if the facts are undisputed, there still may be an issue for the trier of fact when conflicting inferences may be drawn from such undisputed facts." (citing *Preston v. Duncan*, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960))). Moreover, as a disputed issue of material fact, it is not one that can be resolved by an appellate court. *See Edwards v. Morrison-Knudsen Co.*, 61 Wn.2d 593, 598, 379 P.2d 735 (1963) ("The function of ultimate fact finding is exclusively vested in the trial court.").

¶33 Here, the parties ask us to decide a factual matter upon which the application of the taxing statute follows. That, in my opinion, is not the proper function of an appellate court and, as is clear from recent examples, I perceive this as a procedural impropriety resulting in a repetitious review of a disputed material fact at each level of review. *See, e.g., Homestreet, Inc. v. Dep't of Revenue*, 166

Wn.2d 444, 210 P.3d 297 (2009); *cf. Homestreet, Inc. v. Dep't of Revenue*, 139 Wn. App. 827, 162 P.3d 458 (2007). I believe the proper procedure is for the trial court to enter relevant findings of fact, here, whether the Sprint X.25 service is or is not a network telephone service. These findings of fact would then be subject to review by an appellate court under the substantial evidence standard. *Rogers Potato Serv., LLC v. Countrywide Potato, LLC*, 152 Wn.2d 387, 391, 97 P.3d 745 (2004); *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986).

¶34 As it now stands, the trial court reviews the undisputed evidence, rules that it is or is not a network telephone service or other taxable event or process, and then grants or denies summary judgment. Then the aggrieved party appeals, asking three members of this court to review the arguments and undisputed evidence de novo, claiming this is the proper standard of review because the trial court decided the matter on summary judgment. The aggrieved party then seeks review by the Supreme Court, asking nine members of that court to review the arguments and the undisputed evidence de novo. But neither this court nor the Supreme Court has the ability to ask the necessary questions or weigh expert testimony regarding the nature and the function of the system seeking to avoid taxation. *See In re Welfare of Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973) ("As an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses."); *Edwards*, 61 Wn.2d at 598 ("The function of ultimate fact finding is exclusively vested in the trial court."). Our factual determination that the X.25 service is or is not a network telephone service is necessarily a speculative factual finding. The trial court is the only competent court to review the undisputed and/or agreed upon evidence and make the necessary factual determination, here, what is the primary purpose of the X.25 service. While the parties presenting to us numerous cases for review seem to prefer summary judgment, in my opinion, they and the trial courts fail to recognize the difference between undisputed evidence and

the determination of an issue of material fact that must be found by a trial court based on this stipulated evidence.

¶35 Here, it is clear that the parties do not agree that the Sprint X.25 service sold from 1989 to 1993 was a network telephone service. In my opinion, this is a material issue of disputed fact which precludes summary judgment. But because the trial court's opinion that the system is a network telephone service is supported by substantial evidence, I concur in the result.

VAN DEREN, C.J., concurs with QUINN-BRINTNALL, J.

Review denied at 169 Wn.2d 1023 (2010).